NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
BOSTON
HOUSTON
LOS ANGELES
HANOI
HO CHI MINH CITY
ATLANTA



*FIRM and AFFILIATE OFFICES*

FRAN M. JACOBS
DIRECT DIAL: 212.692.1060
PERSONAL FAX: +1 212 202 6413
E-MAIL: fmjacobs@duanemorris.com

www.duanemorris.com

BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE OF DUANE MORRIS*

MEXICO CITY
ALLIANCE WITH
MIRANDA & ESTAVILLO

May 19, 2014

BY ECF FILING AND FEDEX

Hon. Kenneth M. Karas
United States District Court for the Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

    Re:    <u>Consedine v. PepsiCo, Inc. (14 CV 2238)</u>

Dear Judge Karas:

    In accordance with Rule II(A) of Your Honor's Individual Rules of Practice, this letter is submitted on behalf of plaintiff Michael F. Consedine, Insurance Commissioner of the Commonwealth of Pennsylvania, in his capacity as Liquidator of Reliance Insurance Company ("Reliance"), to respond to the letter from defendant PepsiCo, Inc. ("PepsiCo") describing PepsiCo's proposed motion to dismiss.

    The thrust of PepsiCo's argument is that its obligation to pay retrospective premiums terminated under Section VI of the Premium Agreement and that it therefore has no further obligations to Reliance because it has already paid Reliance more than a total of $5,724,146[1] – the amount PepsiCo contends represents the maximum amount it can be required to pay. This argument is baseless. As the Policies to which the Premium Agreement relates make clear, and other pre-litigation documents confirm, when Section VI of the Premium Agreement refers to "the sum of all payments made by or on behalf of the Insured hereunder," it is referring only to the additional Retrospective Premium Adjustments due under the Premium Agreement.[2] Because it is undisputed that PepsiCo has not paid Reliance a total of $5.7 million in additional Retrospective Premium Adjustments, the Premium Agreement did not terminate and PepsiCo is

---

    [1]    PepsiCo uses the figure $5,725,146 in its letter. This appears to be a typographical error.

    [2]    This reading of the Premium Agreement is borne out by the chronology. PepsiCo was required to deposit $3 million with Reliance on January 1, 1991 and to pay Reliance a premium of $4 million on January 3, 1991. But the Premium Agreement was not signed by Reliance until August 16, 1991 or by PepsiCo until February 17, 1992. The only payments that were not already in place when the Premium Agreement was signed were the Retrospective Premium Adjustments due thereunder.

DUANE MORRIS LLP
1540 BROADWAY   NEW YORK, NY 10036-4086               PHONE: +1 212 692 1000   FAX: +1 212 692 1020

Hon. Kenneth M. Karas
May 19, 2014
Page 2

DuaneMorris

liable for the amounts Reliance seeks to recover in this action.

Endorsement No. 2 to the Comprehensive General Liability Insurance Policy issued to PepsiCo, effective January 1, 1991, which applies to all three lines of insurance issued by Reliance – workers' compensation, general liability, and automobile liability – provides that the policy is subject to a minimum premium of $7,000,000." (A copy of Endorsement No. 2 is annexed hereto as Exhibit A.[3]) It further provides that, "if the total incurred losses for all lines combined exceed $5,800,000, Reliance National will bill PFS for all incurred losses excess of $5,800,000 by applying a factor of 1.27 to all incurred losses excess of $5,800,000, subject to a maximum *additional* premium of $5,500,000. The maximum *additional* premium will be adjusted at a rate of $7.59616 per $100 total payroll, subject to a minimum of $5,500,000." (Emphasis added.) The Endorsement is part of the same transaction as the Premium Agreement, and the two must be read together. TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) ("Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together . . . .'") (brackets in original and citation omitted).

This provision of the Policies is entirely consistent with the parties' understanding. Indeed, it came directly from Reliance's proposal, which PepsiCo accepted. (A copy of the accepted proposal is annexed hereto as Exhibit B.) Like Endorsement No. 2, the proposal states that, in addition to a minimum payment of $7 million, "if the total incurred losses for all lines combined exceed $5,800,000, Reliance National will bill PFS for all incurred losses excess of $5,800,000 . . . subject to a maximum *additional* premium of $5,500,000. The maximum *additional* premium will be . . . subject to a minimum of $5,500,000." (Emphasis added.)

By themselves, these two documents establish that PepsiCo knew the retrospective premiums were payable in addition to PepsiCo's initial $7 million payment. There is, however, further evidence that PepsiCo understood exactly how the retrospective premiums were supposed to work. On January 10, 1991, PepsiCo's insurance broker sent a memorandum to PepsiCo describing the "program design of the January 1, 1991 PFS casualty renewal" as follows:

- "A minimum and deposit premium of $7,000,000 . . . is paid to Reliance at January 1, 1991";

- "An Aggregate Deductible Limit of $3,000,000 is applicable under this plan . . . [and] is included in the $7,000,000 cash deposit premium";

- "If the total incurred losses for all lines combined exceed $5,800,000 . . . Reliance bills PFS for all incurred losses excess of the $5,800,000 . . . subject to a maximum *additional* premium of $5,500,000. The maximum *additional* premium is . . . subject to a minimum of $5,500,000."

---

[3] These documents are not annexed to the complaint because PepsiCo had made entirely different arguments in response to Reliance's pre-litigation demands for payment, and Reliance had no reason to anticipate that PepsiCo would argue that the Premium Agreement terminated.

(A copy of PepsiCo's broker's memorandum is annexed hereto as Exhibit C; emphasis added.)

PepsiCo's argument that the Premium Agreement terminated because Reliance has been paid more than $5.7 million – $4 million of which was a minimum premium payable on January 3, 1991 pursuant to Section III.A of the Premium Agreement and $1,783,678 of which consisted of Retrospective Premiums payable after Aggregate Incurred Losses Payable reached $5.8 million – is not only inconsistent with the terms of Endorsement No. 2 and other documents which show that PepsiCo was obligated to make at least $5.5 million of <u>additional</u> premium payments, it would render Sections III.B and C of the Premium Agreement meaningless. In January 1991, PepsiCo paid an initial premium of $4 million and also made a $3 million deductible deposit. Reliance had a right to use the deductible deposit "in reimbursement for any Losses within the Aggregate Combined Deductible" of $5.8 million. (Premium Agreement § II.B.) Since PepsiCo's obligation to pay Retrospective Premiums arose only when the Aggregate Incurred Losses Payable were at least $5.8 million, by the time this obligation was triggered, PepsiCo would already have paid Reliance a total of $7 million ($4 million initial premium plus $3 million deductible deposit) – which is more than the Maximum Retrospective Premium Adjustment. Thus, under PepsiCo's reading of the Premium Agreement, PepsiCo would never have to pay any Retrospective Premiums and Section III.C would be meaningless. <u>Gorman</u> v. <u>Consol. Edison Corp.</u>, 488 F.3d 586, 596 n. 9 (2d Cir. 2007) ("canons of construction forbid contractual interpretations that lead to absurd results"); <u>Greenwich Cap. Fin. Prods., Inc.</u> v. <u>Negrin</u>, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) ("a 'contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties'") (citation omitted).

To avoid an obviously illogical result, PepsiCo simply ignores the $3 million deductible deposit. But the termination section of the Premium Agreement refers to "all payments made by or on behalf of the Insured. . . ." If the $4 million premium payable on January 3, 1991 is included in this calculation, there is no reason to exclude the $3 million deductible deposit paid on January 1, 1991. Neither payment should be included in the termination section calculation. Endorsement No. 2 and the other documents referred to above establish that PepsiCo was obligated to pay Reliance $7 million plus <u>additional</u> retrospective premiums of a minimum of $5.5 million, subject to adjustment. Since PepsiCo does not purport to have paid more than $5.7 million in additional retrospective premiums (as adjusted), its obligations under the Premium Agreement have not terminated and the sole basis of its motion to dismiss fails.

In short, Reliance has stated valid claims and those claims should proceed.

Respectfully,

*Fran M. Jacobs*

Fran M. Jacobs

Enclosures
cc: Peter Laun, Esq. (By ECF)
    Lisa M. Cirando, Esq. (By ECF)

# EXHIBIT A

(The Attaching Clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

GU 207
(Ed. 6-78)

# ENDORSEMENT #2

This endorsement, effective on 1/1/91 at 12:01 A.M. standard time, forms a part of

Policy No. NGB 149 86 17-00 of the **PLANET INSURANCE COMPANY**
(NAME OF INSURANCE COMPANY)

Issued to PFS, A DIVISION OF PEPSICO, INC.

By

_____
Authorized Representative

## COMPOSITE RATING PLAN ENDORSEMENT

## COMPREHENSIVE GENERAL LIABILITY INSURANCE

A COMPOSITE RATE OF $9.66784 PER $100. TOTAL PAYROLL (INCLUDING MONO STATES) WILL BE APPLIED TO ALL LINES (WC, GL, AL) COMBINED, SUBJECT TO A MINIMUM PREMIUM OF $7,000,000. IN ADDITION, IF THE TOTAL INCURRED LOSSES FOR ALL LINES COMBINED EXCEED $5,800,000., RELIANCE NATIONAL WILL BILL PFS FOR ALL INCURRED LOSSES EXCESS OF $5,800,000. BY APPLYING A FACTOR OF 1.27 TO ALL INCURRED LOSSES EXCESS OF $5,800,000., SUBJECT TO A MAXIMUM ADDITIONAL PREMIUM OF $5,500,000. THE MAXIMUM ADDITIONAL PREMIUM WILL BE ADJUSTED AT A RATE OF $7.59616 PER $100. TOTAL PAYROLL, SUBJECT TO A MINIMUM OF $5,500,000.

THE ADJUSTMENTS OF ANY ADDITIONAL PREMIUM WILL BE MADE BASED ON LOSSES VALUED AS OF 12/31 OF EACH YEAR.

**ANNUAL PAYROLL** - WHEN USED AS A PREMIUM BASIS, THIS SHALL MEAN THE TOTAL ANNUAL REMUNERATION FROM THE INSURED'S OPERATIONS AS DEVELOPED BY AUDIT FOR THE POLICY TERM.

| COVERAGE | COMPOSITE RATE PER $100. PAYROLL | ESTIMATED ANNUAL PAYROLL | PREMIUM |
|---|---|---|---|
| AS STATED IN THE POLICY | $9.66784 | $ TO BE DETERMINED | $180,000. DEPOSIT PREMIUM |

NOTHING HEREIN CONTAINED SHALL BE HELD TO WAIVE, VARY, ALTER OR EXTEND ANY CONDITION OR PROVISION OF THE POLICY OTHER THAN AS ABOVE STATED.



# EXHIBIT B

**Reliance National**
A Reliance Group Holdings Company
77 Water Street
New York, NY 10005
212.858.3600
Fax: 212.858.3612


**Reliance**

December 27, 1990

Mr. James Hunter
Assistant Vice President
Johnson & Higgins of Texas, Inc.
One Dallas Centre
Dallas, Texas 75201

RE: PFS, A DIVISION OF PEPSICO, INC.
    ACCEPTED CASUALTY PROPOSAL
    EFFECTIVE: 1/1/91-92

Dear Jim:

Attached is a copy of our revised and accepted proposal which will also serve as our confirmation of the coverages bound effective 1/1/91-92 for PFS, a Division of Pepsico, Inc.

Please review it and get back to me immediately if you find any area(s) of disagreements.

Thank you very much for your help in obtaining the account for us and we are looking forward to working with you in the months ahead.

Have a happy New Year!

Cordially yours,

Joseph S.D. Seid
Assistant Vice President
National Accounts

cc: Basil Paulakis

JSDS/sn

PFS, A DIVISION OF PEPSICO
EFFECTIVE 1/1/91-92 (WC, GL, AL)

I.  COVERAGES & LIMITS OF LIABILITY

    Workers' Compensation — Statutory

    Employer's Liability — $2,000,000/2,000,000/2,000,000

    General Liability — $2,000,000 CSL per occurrence
    $2,000,000 aggregate products
    $2,000,000 General aggregate
    $2,000,000/claim/aggregate for Employee Benefit Liability
    $2,000,000/occ for advertising Liability
    $2,000,000/occ for Fire Legal Liability
    $5,000/person - Premises medical

    Automobile Liability — $2,000,000 CSL each accident
    UM — Min. statutory or $250,000/acc. whichever is less
    PIP — Statutory minimum

II.  EXCEPTIONS TO COVERAGE SPECIFICATIONS

    Workers' Compensation — 1. State of Mass. is excluded.

    Automobile Liability — 1. State of Mass. is excluded.
    2. Physical damage coverage will not be provided.

    General Liability — 1. Absolute asbestos Exclusion applied.
    2. Absolute PCB Exclusion applied.
    3. Pollution Exclusion applied except for hostile fire.
    4. Watercraft Liability coverage to be provided up to 50' in length.

III. RATES/PREMIUMS        Estimated WC payroll = $72,405,000 (including mono states)

A composite rate of $9.66784 per $100 total payroll (including mono states) will be applied to all lines (WC,GL,AL) combined, subject to a minimum premium of $7,000,000. In addition, if the total incurred losses for all lines combined exceed $5,800,000, Reliance National will bill PFS for all incurred losses excess of $5,800,000 by applying a factor of 1.27 to all incurred losses excess of $5,800,000, subject to a maximum additional premium of $5,500,000. The maximum additional premium will be adjusted at a rate of $7.59616 per $100 total payroll, subject to a minimum of $5,500,000.

The adjustments of any additional premium will be made based on losses valued as of 12/31 of each year.

The minimum premium of $7,000,000 will be due and payable via wire-transfer of funds to Reliance on 1/3/1991 to:

Corestate Bank<br>
ABA# 031-0000-11<br>
Philadelphia, PA<br>
Account Name: Reliance Insurance Co.<br>
Account #: 07610702

IV. SECURITY REQUIREMENTS

As a means of offsetting the unearned premium, we will require an irrevocable and clean Letter of Credit for $5,500,000 from an approved bank, on or before 1/31/91 (preferably by 1/3/91). Refer to sample wording for LOC attached. The maximum amount of LOC will be adjusted at a rate of $7.59616 per $100 total payroll subject to a minimum of $5,500,000. It is agreed and understood that the amount of LOC will be reduced by the same amount as the additional cash received by Reliance at future date, as applicable.

Furthermore, we will require to execute a collateral agreement (sample attached) between PFS and Reliance upon binding of coverages.

Alternatively, we would be agreeable to accept a parental guarantee from Pepsico, Inc. in place of Letter of Credit, provided that such a guarantee be signed by an authorized officer of Pepsico, Inc.

V. AGGREGATE DEDUCTIBLE LIMIT

An aggregate deductible limit for GL,AL,WC combined for $3,000,000 would be applicable under this program. It is agreed and understood that the aggregate deductible amount is to be collateralized with 100% cash (included in the $7,000,000 cash deposit premium).

VI. CLAIMS HANDLING

This program contemplates the use of a third party administrator for claims handling. All claims (WC,GL,AL) are to be serviced by Crawford & Co. All claims handling costs will be borne by PFS and be paid to Crawford & Co. directly by PFS. The claims service contract will be drawn between Crawford & Co. and Reliance with the costs to be paid for by PFS.

## VII. LOSS CONTROL ENGINEERING

We have included in our pricing for Loss Control coordination by a Reliance National Loss Control specialist and for Texas locations on an "as needed" basis. Any additional Loss Control services are to be billed as incurred.

## VIII. SPECIAL NOTES

1. Commission to J&H - none contemplated in quote.

2. Countersignature fees - payment of all applicable countersignature fees will be J&H's responsibility.

3. Profit-sharing agreement - This program is not subject to any contingent commission agreement Reliance may have with J&H or any of its subsidiaries.

4. Premium surcharges and tax assessments - included in price quoted herein.

5. Premium agreement will be executed upon binding of coverages.

SUBMITTED BY: *[signature]*
Joseph S.D. Seid

RELIANCE NATIONAL RISK SPECIALISTS

DATE ACCEPTED BY JOHNSON & HIGGINS: 12/21/90

# PFS
## 1991 PROJECTED PAYROLL DISTRIBUTION

| State | Total | Driver | Warehouse | Administration |
|---|---|---|---|---|
| Arizona | $ 1,516,300 | $ 914,800 | $ 337,500 | $ 264,000 |
| California | 8,911,800 ✓ | 3,863,900 | 1,425,800 | 3,622,100 |
| Colorado | 2,039,100 | 1,217,600 | 449,300 | 372,200 |
| Florida | 3,311,500 | 2,164,200 | 798,600 | 348,700 |
| Georgia | 3,252,000 | 2,009,200 | 741,400 | 501,400 |
| Indiana | 2,547,900 | 1,431,200 | 627,900 | 488,800 |
| Kansas | 12,867,400 ✓ | 2,077,800 | 832,000 | 9,957,600 |
| Kentucky | 45,000 | | | 45,000 |
| Michigan | 2,657,600 | 1,634,300 | 603,100 | 420,200 |
| Minnesota | 1,008,500 | 563,400 | 207,900 | 237,200 |
| Mississippi | 1,581,400 | 911,400 | 336,300 | 333,700 |
| New Jersey | 2,577,800 | 1,610,400 | 594,200 | 373,200 |
| New York | 1,630,800 | 976,500 | 360,300 | 294,000 |
| North Carolina | 2,437,700 | 1,502,500 | 554,400 | 380,800 |
| Ohio | 2,745,700 | 1,699,700 | 627,200 | 418,800 |
| Oklahoma | 1,154,100 | 643,000 | 237,200 | 273,900 |
| Oregon | 1,470,100 | 823,000 | 303,700 | 343,400 |
| Pennsylvania | 1,814,100 | 1,054,600 | 389,100 | 370,400 |
| Tennessee | 1,969,100 | 1,166,600 | 430,500 | 372,000 |
| Texas | 10,170,200 ✓ | 2,582,500 | 952,900 | 6,634,800 |
| Virginia | 2,842,400 | 1,801,400 | 664,700 | 376,300 |
| Wisconsin | 3,072,300 | 1,928,500 | 711,600 | 432,200 |
| **Subtotal** | $71,622,800 | $32,576,500 | $12,185,600 | $26,860,700 |
| Miscellaneous Furniture Manufacturing (Kansas) | | | 782,900 | |
| **Total Payroll** | | | | $72,405,700 |

JOHNSON & HIGGINS

# EXHIBIT C

**J&H HIGGINS**

| | |
|---|---|
| To<br>Steve Lawrence - PepsiCo, Inc. | Date<br>January 10, 1991 |
| From<br>Jim Hunter | Copies To<br>Brad Smith - PFS<br>J. Cameron Campbell<br>R. Kevin Dwyer |

Subject

PFS
January 1, 1991 Renewal

In response to your request during our telephone conversation of January 8, following is a critique of the events and program design of the January 1, 1991 PFS casualty renewal.

During a mid-term meeting Brad Smith and I attended with Bob Lloyd at Old Republic, the incumbent carrier, in August, Old Republic appeared pleased with the way the PFS program was running and no major changes were anticipated for the January 1, 1991 renewal. Although our expectations were that a renewal with Old Republic would be likely, Brad and I decided to approach a few select carriers in the event that back up quotations would be necessary.

In November, J&H's Louisville office alerted me that the KFC renewal negotiations with Old Republic were not progressing as expected. In light of this information, we began pressing Old Republic to provide us an early renewal quotation and also began aggressively pursuing the alternate carriers for their quotations.

Old Republic provided a Discounted Guaranteed Cost renewal quotation of $9,437,562, roughly a 51% increase over the 1990 deposit premium versus PFS's projected growth of approximately 20%. The basis of Old Republic's quotation was their loss projection of $7,306,000.

Quotations from the other carriers provided a broad range of plan designs, Kemper Group proposed a Large Risk Dividend/Deductible Plan, CIGNA proposed a Paid Loss Cash Collateral Retrospective Rating Plan and Reliance proposed an Aggregate Deductible Swing Plan.

The Reliance Aggregate Deductible Swing Plan proved to be the most competitive at Corroon & Black's recommended loss forecast of $5,770,000.

The Reliance plan design follows:

A minimum and deposit premium of $7,000,000, adjustable at a composite rate of 9.66784 per $100 of total payroll, is paid to Reliance at January 1, 1991.

An Aggregate Deductible Limit of $3,000,000 is applicable under this plan. The Aggregate Deductible amount is included in the $7,000,000 cash deposit premium.

If the total incurred losses for all lines combined exceed $5,800,000, based on losses valued at December 31 of each year, Reliance bills PFS for all incurred losses excess of the $5,800,000, times a factor of 1.27, subject to a maximum additional premium of $5,500,000. The maximum additional premium is adjusted at a rate of 7.59616 per $100 of total payroll subject to a minimum of $5,500,000.

The maximum total premium payable under the plan is $11,300,000. Expenses, (RML's, Boards, Fees and Taxes) exclusive of commission to J&H and Countersignature Fees, are included in the program. Reliance's estimated expenses are $750,000 to $1,000,000.

The difference between the $7,000,000 cash deposit premium and maximum premium of $11,300,000 is to be secured by a Premium Agreement and Parental Guarantee. The details and signature of these agreements are pending review by PepsiCo, PFS, KFC, Johnson & Higgins and of course Reliance National.

In addition to the primary casualty program with Reliance, we also renewed the Bufferela with the U.S. Fire Insurance Company. The limits under the Bufferela are:

a) $3MM/$8MM/$8MM excess of primary General Liability limits of $2MM/$2MM/$2MM.

b) $3MM excess of primary Automobile liability/$2MM

c) $3MM excess of primary Employers Liability/$2MM.

d) $3MM excess of $25,000 Self Insured Retention were applicable.

The premium for the Bufferela is $209,000.

I trust that the above synopsis satisfactorily responds to your request. In the event I have overlooked anything or should you require additional information, please let me know.

:dlb